UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABDULLAH Y. SALAHUDDIN,

                    Plaintiff

          -v-                                          No. 99 Civ. 10431 (LTS)

ADA PEREZ, et al.,

                    Defendants.

_____

<u>OPINION AND ORDER</u>

Plaintiff brings this action under 42 U.S.C. § 1983 and the First and Fourteenth

Amendments of the United States Constitution, alleging constitutional violations of freedom of

association, freedom of religion, the establishment clause, equal protection, and procedural and

substantive due process.  Defendants move for summary judgment, seeking an order dismissing

Plaintiff's Amended Complaint in its entirety.  For the following reasons, Defendants' motion is

granted with respect to all of Plaintiff's claims.


**I. Background**

The following material facts are undisputed unless otherwise indicated.  During the

relevant time period, Plaintiff Abdullah Y. Salahuddin was a prisoner in the custody of the New

York State Department of Correctional Services ("DOCS") at Fishkill Correctional Facility

("Fishkill"), which is a medium-security facility.  (Salahuddin Aff. ¶ 3; Perez Aff. ¶ 2.)

The following are the defendants and their occupational roles at the time of the complained of matters in this case: Ada Perez, Deputy Superintendent for Program Services at Fishkill; Wayne Strack, Superintendent at Fishkill; William Mazzuca, First Deputy Superintendent at Fishkill; Robert Jones, Assistant Deputy Superintendent for Programs at Fishkill; Carlton Good, Senior Counselor at Fishkill; Librado Cayco, inmate counselor at Fishkill; Joann Walsh, Freedom of Information Law ("F.O.I.L") officer at Fishkill; Mr. Goidel, inmate grievance program supervisor at Fishkill; Carol Lugert, Volunteer Services Coordinator at Fishkill; Glenn Goord, Commissioner of DOCS; and Raymond Broaddus, Deputy Commissioner for Program Services at DOCS (hereafter "Defendants").

In October of 1997, Plaintiff, who has been incarcerated since 1978 and who earned bachelor's and master's degrees while in prison, submitted a proposal to the Fishkill prison authorities to create a prison inmate organization called Project Build. Plaintiff proposed that Project Build be an organization with membership limited to "long-term" inmates (i.e., those serving sentences of at least 15 years), provide services such as counseling for inmates on personal and family issues, prepare prisoners for release back into the general public, and offer a one-year certificate program called the Certificate in Ministry Program (the name of which was later changed to the Certificate in Human Services Program ("CMP/CHSP")) in conjunction with the New York Theological Seminary ("NYTS"). (Perez Aff. ¶¶ 4-5; Salahuddin Aff. ¶ 10.) The CMP/CHSP would offer a theological education centered around many religious faiths to allow individual prisoners to examine their life experiences in light of their particular religious beliefs. A prisoner student who successfully completed this year-long program would receive 36 college

credits and a Certificate in Ministry (later changed to a Certificate in Human Service). (Perez Aff. ¶ 6; Salahuddin Aff. ¶ 10.)

Plaintiff's proposal was denied by the prison authorities (though, as discussed below, they did later implement the CMP/CHSP component of his proposal). Plaintiff complains that the proposal was not processed in accordance with established administrative procedures, but he did not appeal the denial. Defendants proffer that they denied approval of the non-CMP/CHSP aspects of the program in light of their interests in preserving resources at the prison, as the other aspects would have been duplicative of services already available at the prison through established inmate organizations and other programs. (Perez Aff. ¶¶ 8-11, Ex. G.) Plaintiff argues that no such duplication would have occurred and that his proposed long-term inmate organization was both sufficiently unique and desirable. (Salahuddin Aff. ¶¶ 12, 31.) Defendants further proffer that, due to the demographics of Fishkill's medium-security inmate population, the limited potential membership of a long-term inmate organization could have rendered the proposed inmate organization unfeasible, and that the establishment of a long-term inmate organization at the medium security facility would have been against prison policy. (Perez Aff. ¶ 9 and Ex. C.)

Defendants later implemented CMP/CHSP under the auspices of Fishkill's senior coordinating prison chaplain, the Reverend Ernest Boston (who was a Christian minister), and the prison educational department, although both Plaintiff and Muslim prison Chaplain Imam Muhammad played "an active role" in setting up the program. (Perez Aff. ¶¶ 10-11.) Plaintiff argues that the defendant prison officials who were involved in the decision rejected the CMP/CHSP aspect of his proposal by reason of bias against Plaintiff as a Muslim and in favor of

the Christian chaplain. Defendants proffer that, in making the decision to implement the program under the prison chaplain and educational departments, the Fishkill authorities considered the fact that the CMP/CHSP programs at other DOCS facilities (including Sing Sing and Woodbourne, where Plaintiff had previously served as an instructor in the program) were run by the education departments and not by inmate organizations. (Perez Aff. ¶12, Salahuddin Aff. ¶ 5.) Defendants also point out that Plaintiff acknowledged in his deposition that the CMP/CHSP programs in which he had previously taught were maintained under prison education department auspices (Perez Aff. ¶12, Def. Ex. D.) Also, Chaplain Boston had expressed interest to the Defendants in supervising the CMP/CHSP program while Plaintiff's proposal was under consideration (although Plaintiff asserts this was unknown to him at the time). (Salhuddin Aff. ¶¶ 25-27.) Plaintiff was given a role in the program as an instructor and liaison to the prison administration. (Perez Aff. ¶11.)

Plaintiff revised and resubmitted his long-term inmate organization proposal without the CMP/CHSP component. (Salahuddin ¶¶ 27-28.) Again, Defendants rejected his proposal, citing the penological interests of "security, rehabilitation and [conservation of] resources." (Perez Aff. ¶¶ 16-20.) Plaintiff thereafter filed grievances with the prison and a F.O.I.L. request to obtain a further explanation for the denial of this second proposal. Plaintiff alleges that defendants failed to comply with established procedures in processing his second proposal, grievances, and F.O.I.L. request, and asserts that his proposal was denied due to bias against him as an African-American, Muslim man serving a lengthy sentence for a violent crime. His grievances also cited his upbringing in a "poor neighborhood" as a basis for Defendants' alleged bias against him.

(Am. Compl. ¶¶ 108-109; Am. Compl. ¶ 66; Pltf. Ex. 32.[1])

Defendants deny that any such discrimination occurred, cite the resource, policy and duplication considerations summarized above, and assert that, despite delays in the processing of paperwork, Plaintiff's paperwork was eventually properly addressed. (Perez ¶¶ 13-14.) Defendant Perez also encouraged Plaintiff to pursue his program-creation and leadership goals through existing inmate organizations and institutional programs. (Perez Aff. ¶¶ 14, 16, 21.)

In January 1998, a proposal was communicated to the Fishkill administration for a Black History Month commemoration event honoring the late El-Hajj Malik Shabazz, who was also known as Malcolm X. Although Plaintiff asserts in his affidavit that he made the proposal, his documentary evidence of the proposal consists of a memorandum to Defendant Perez from Chaplain Muhammad. (Salahuddin Aff. ¶ 48; Pltf. Ex. 43.) Defendant Perez had doubts as to the propriety of celebrating Malcolm X and questioned whether Malcolm X was a "recognized" African American "hero." (Perez Aff. ¶ 48; Salahuddin Aff. ¶ 50; Pltf. Ex. 44.) Perez communicated her concerns to Chaplain Muhammad, who altered the proposal to remove the focus on Malcolm X; Fishkill's mosque community thereafter had a successful and popular Black History Month program. (Perez Aff. ¶¶ 51-52; Muhammad Aff. ¶ 5; Pltf. Ex. 45-B.)

---

[1] In connection with his opposition to Defendants' motion, Plaintiff provided some 70 Exhibits to the Court (approximately a 3-inch stack of documents) but did not serve them on defense counsel, requesting instead that the Court make copies for Defendants. By letter copied to defense counsel, the Court informed Plaintiff that it does not have the resources to provide copying and service facilities even for pro se litigants. Defendants thereafter requested that the documents be disregarded. In light of the Court's determination that the motion should be granted, and consistent with the generous treatment afforded to pro se litigants the Court has, however, reviewed the exhibits in connection with its evaluation of the motion.

In January 1998, Defendant Perez directed the removal of the names of 39 inmates from a list of approved attendees for a special meal celebrating the end of the Ramadan fast, called "Eidul Fitr." Plaintiff asserts that the inmates whose names were removed had been approved by Chaplain Muhammad and that Perez improperly inserted herself into religious administration by removing the names. Defendants have proffered affidavits by Perez and Muhammad documenting the involvement of Chaplain Omar, the Central Office Muslim chaplain "who was responsible for monitoring and coordinating all Muslim activity at all DOCS facilities," in the decision to remove the names and confirmation that Chaplain Muhammad concurred in the determination that those whose names were removed were properly denied participation. (Perez Aff. ¶ 53-58; Muhammad Aff. ¶ 5.)

In April 1999, based on a tip from within the chaplaincy service, a review of Chaplain Muhammad's phone records and an interview of Chaplain Muhammad, Fishkill's administrators learned that Plaintiff had participated in a number of private phone calls to members of his family that were placed from Chaplain Muhammad's private phone line at the facility. Chaplain Muhammad had not remained in Plaintiff's presence during the calls. (Perez Aff. ¶¶ 33-38; Def. Exh. P; Muhammad Aff. ¶ 6.) DOCS' policy restricts inmates' ability to make telephone calls and requires that all inmate calls be monitored; the telephone calls were thus in violation of prison rules notwithstanding Plaintiff's proffers that the calls were made in connection with counseling by the Chaplain on a delicate family matter. (Perez Aff. ¶ 33; Def. Ex. O, Q, R; Salahuddin Aff. ¶ 64.)

Defendant Perez represents that she concluded that the telephone calls were indicative of an "inappropriate relationship" between the Chaplain, who was a staff member, and Plaintiff, an

inmate who was officially designated as an aide to the Chaplain and was a leader of the Muslim community within the inmate population. Defendant Perez further proffers that she concluded that the Chaplain's lapse of judgment in this connection had "empowered" Plaintiff, creating a situation dangerous in a prison setting and, on the basis of these conclusions, determined that the two had to be separated by means of transfer of the Plaintiff to another facility. (Perez Aff. ¶ 40.) Perez' office requested the transfer on or about July 8, 1999 (Am. Compl. ¶ 90); it was carried out on July 16, 1999, the day before Plaintiff was scheduled to have a conjugal "trailer visit" with his wife. Plaintiff's wife was not informed of the transfer in advance of the visit, and therefore traveled to Fishkill and incurred expenses in connection with that trip. Plaintiff also contends that his wife suffered psychological harm and emotional upset upon learning of the transfer, and that he himself was taken to the new facility, Woodbourne, by a circuitous route and was shackled and held in substandard facilities in the course of the journey. (Am. Compl. ¶ 95.) Plaintiff asserts that the transfer was ordered in retaliation for his prior grievances concerning his efforts to establish Project Build and other matters. (Salahuddin Aff. ¶ 73.)

On the basis of the foregoing events, Plaintiff instituted this action under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution, suing Defendants in both their individual and official capacities. Specifically, Plaintiff alleges violations of:

(1) his First Amendment right to free association due to the denial of Project Build;

(2) his First Amendment right to the free exercise of religion due to the denial of permission to hold the celebration of Malcolm X's life, the removal of 39 inmates from

Eidul Fitr, and the allegedly retaliatory transfer for receiving Islamic counseling from Imam Muhammad (Am. Compl. ¶¶ 101-103);

(3) his Fourteenth Amendment right to procedural due process in relation to the processing of his paperwork for Project Build and the celebration of Malcolm X's life (Am. Compl. ¶107);

(4) the First Amendment Establishment Clause, to the extent that Fishkill allowed the Christian chaplaincy rather than Plaintiff to operate the CMP/CHSP (Am. Compl. ¶¶ 104-105);

(5) his First Amendment right to seek redress from the government as a result of the allegedly retaliatory transfer (Am. Compl. ¶¶ 99-100); and

(6) his right to equal protection under the Fourteenth Amendment due to Defendants' alleged discrimination towards Plaintiff based on his race, religion, and prisoner status (Am. Compl. ¶¶ 108-109).

Plaintiff seeks various remedies.  First, he seeks a declaratory judgment that Defendants' conduct violated his First and Fourteenth Amendment Constitutional rights.  Second, Plaintiff asks for compensatory damages in the amount of $25,000.00 and punitive damages in the amount of $30,000.00.  Third, Plaintiff seeks injunctive relief transferring him back to Fishkill for the purposes of establishing Project Build at Fishkill, teaching in the CMP/CHSP program at Fishkill, and having the conjugal visit that his transfer allegedly denied him. (Am. Compl. ¶¶ A-D).

## II.    Discussion

## A.    Summary Judgment

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(c).  In deciding a motion for summary judgment, the Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor."  Amer. Casualty Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994).  In addition, because Plaintiff is acting pro se, the court must "read his supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994); accord Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995).

Nevertheless, to defeat a motion for summary judgment, "[o]nce the moving party has come forward with support in the form of the pleadings, depositions, interrogatory answers, admissions or affidavits that no genuine issue of material fact remains to be tried, the opposing party has the burden of providing similar support setting forth specific facts about which a genuine triable issue remains."  Borthwick v. First Georgetown Securities, Inc., 892 F.2d 178, 181 (2d Cir. 1989).  This burden can not be met "merely by vaguely asserting the existence of some unspecified disputed material facts," id., or through "mere conjecture or speculation." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).

Instead, to defeat a motion for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, (1986).  A plaintiff must "come forward with enough

evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely . . . on the basis of conjecture and surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)). A party opposing a motion for summary judgment "may not rest on the pleadings, but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); see also Fed. R. Civ. P. 56 (c) and (e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, (1986).


**B.     Transfer-Related Claims**

Plaintiff claims that his transfer from Fishkill violated his constitutionally protected First Amendment rights in two ways. First, Plaintiff claims that his transfer was in retaliation for the complaints (including to state Senators and Congressmen) and grievances he made regarding the denials of his various applications. (Salahuddin Aff. ¶ 73; Am. Compl. ¶¶ 78-83, 94.) Second, Plaintiff alleges that his transfer violated his rights of free exercise and free association because it disrupted his religious practices and related prison community relationships at Fishkill. (Am. Compl. ¶ 102). Defendants are entitled to summary judgment on both of those claims.

Prisoners normally have no constitutional right to remain in any particular state prison facility, absent a state statute or policy conditioning transfers on proof of specific acts of misconduct. Meachum v. Fano, 427 US 215, 229 (1976). Prison officials thus have broad discretion in making transfer determinations. Meriwether v. Coughlin, 879 F.2d 1037, 1045

(1989).  "They may not, however, transfer [prisoners] solely in retaliation for the exercise of constitutional rights."  Id. at 1046.

Where, as here, an adverse action (such as a transfer) is challenged as retaliatory in violation of the First and Fourteenth Amendments, the plaintiff has the burden in the first instance of demonstrating that the underlying conduct that precipitated the adverse action was constitutionally protected and that said conduct was a substantial or motivating factor in the defendant's subsequent adverse conduct.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  If the plaintiff meets that burden, the defendants have the opportunity to demonstrate by a preponderance of the evidence that they would have reached the same decision even in the absence of the protected conduct.  Id.

Assuming arguendo that Plaintiff's grievances were constitutionally protected, his evidence that this protected activity was a substantial or motivating factor in the Defendants' transfer decision is weak at best, as it consists principally of his own conclusory assertions.  It is unnecessary, however, to determine whether there is triable issue of fact in that regard, as there is no genuine issue of material fact as to whether Defendants have met their burden of demonstrating that the transfer decision would have been made regardless of the protected conduct.  It is undisputed that Plaintiff participated in unmonitored phone calls to family members that were made on Imam Muhammad's private line and outside of the normal procedures and restrictions relating to inmate telephone calls.  Plaintiff has proffered no evidence to refute Defendants' showing that the calls violated established DOCS policy, nor has Plaintiff raised any genuine issue of fact as to whether the defendant administrators concluded in light of the calls that it was necessary to separate him from Imam Muhammad by transferring him to

another DOCS facility. No reasonable factfinder could conclude on this record that Defendants have failed to meet their burden under <u>Mt. Healthy</u>. Thus, Plaintiff's contention that the transfer was illegitimate as a violation of his constitutional rights fails.

In light of the determination that the transfer was not violative of his constitutional rights, Plaintiff's additional claims relating to the transfer – namely that it violated his free exercise and associational rights by separating him from his counseling relationship with Chaplain Muhammad, preventing him from pursuing the Project Build inmate organization and teaching in the CMP/CHSP program, and preventing him from having his conjugal visit – and his requests for injunctive relief in connection with the transfer-related claims, are moot.

Were the Court, however, to address Plaintiff's injunctive relief demand relating to his transfer-related inability to pursue Project Build and teach in CMP/CHSP are premised on the notion that the transfer itself violated his right to the free exercise of religion, the claim would still fail as a matter of law. In evaluating a prisoner's free exercise of religion claim, the Court considers four factors: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) whether the prisoner still has alternative means of exercising the religious right; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) what ready alternatives to the restriction exist. <u>Turner v. Safley</u>, 482 U.S. 78, 90-91 (1987).

Here, there is a valid, rational connection between the Defendants' decision to transfer Plaintiff and the penological objectives put forward by the Defendants. It is undisputed that Plaintiff violated the prison rules, and that Defendants concluded that a dangerous situation was

created by that violation, and that it was "not practicable to separate plaintiff and the chaplain by any means other than a transfer." (Perez Aff. ¶ 40). Further, Plaintiff has not alleged that he has no alternative means of exercising his religious rights at his new facility. As the Supreme Court recently reiterated, a prison's interests in maintaining order and safety are compelling government interests, and relevant case law and statutes do not allow accommodation of prisoners' religious observation to be elevated over the prison's interest in maintaining order and safety. Cutter v. Wilkinson, 125 S. Ct. 2113, 2122 (2005) ("We do not read [the Religious Land Use and Institutionalized Persons Act of 2000] to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.").

For these reasons, summary judgment is granted in Defendants' favor on Plaintiff's claims that the transfer violated his First and Fourteenth Amendment expression and free exercise rights, and his claims for injunctive relief restoring him to custody at Fishkill and the status and privileges he enjoyed there are dismissed as moot. The Court turns now to Plaintiff's remaining claims for damages and declaratory relief.

## C.  Official Capacity Claims

Plaintiff's claims are asserted against Defendants in both their official and individual capacities. Defendants have raised the Eleventh Amendment as a bar to the official capacity claims, and those claims must be dismissed for lack of subject matter jurisdiction. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by

Citizens of another state, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend.

XI. It is well settled that the Eleventh Amendment bars suit in federal court "by private parties

seeking to impose a liability which must be paid from public funds in the state treasury."

Edelman v. Jordan, 415 U.S. 651, 663, (1974); see also Pennhurst State Sch. & Hosp. v.

Halderman, 465 U.S. 89, 98-99 (1984). Where state officials are sued for damages in their

official capacities, the action is viewed as one against the state because the damages will be paid

from the state treasury. See Kentucky v. Graham, 473 U.S. 159, 169 (1985). Plaintiff's damage

claims against Defendants in their official capacities are precluded by the Eleventh Amendment,

and are therefore dismissed. See K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of

Health, 189 F.3d 273, 278 (2d Cir. 1999); Labounty v. Coughlin, 2003 WL 21692766, *5

(S.D.N.Y. 2003).


**D. Free Exercise of Religion**

Plaintiff claims that Defendants violated his First Amendment right to the free exercise of

religion by preventing 39 Muslim inmates from attending the January 1998 Eidul Fitr end of

Ramadan celebration. Plaintiff alleges that Defendant Perez improperly removed the inmates in

question from the list of approved celebration participants in usurpation of authority properly

belonging to Chaplain Muhammad. (Salahuddin Aff. ¶ 52.) It is undisputed that Plaintiff himself

attended the celebration. Defendants have proffered evidence, in the form of affidavits, that

Chaplain Muhammad's initial determinations as to eligibility to attend the celebration were

properly reviewed by Perez and the senior Muslim Chaplain coordinator, and that the removal of

the names in question was proper.

As noted above, a prisoner retains only those religious rights under the First Amendment "that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Moreover, federal courts are ill-equipped to adjudicate the complexities of the prison system and therefore grant wide deference to decisions of prison officials by employing a "lesser standard of scrutiny... in determining the constitutionality of prison rules." Turner, 482 U.S. at 81.

As Plaintiff does not have standing to litigate the free exercise claims on behalf of the 39 inmates excluded from the celebration, the Court liberally interprets Plaintiff's complaint to allege that removal of those 39 inmates interfered unconstitutionally with his free exercise of religion by somehow diminishing his personal enjoyment of the religious celebrations. Under the Turner standard and on the undisputed facts of record, this claim must fail. Defendants' evidence makes clear the lines of authority and bases for the determinations regarding eligibility to participate in the celebration. Plaintiff's conclusory assertions that Chaplain Muhammad's initial determinations should have been left undisturbed are insufficient to create any issue of material fact with respect to the existence of a rational connection between the actions and prison governance policies. Moreover, Plaintiff obviously had other means to practice and celebrate Islam: he personally observed Ramadan and celebrated Eidul Fitr. (Perez Aff. ¶ 53). It is also readily apparent that accommodation of an inmate's asserted right to determine the proper attendance for congregate religious activities would have serious prison discipline, governance, security and financial implications.

**E.     Procedural Due Process**

Plaintiff also claims that his Fourteenth Amendment right to procedural due process was violated when Defendants failed to adhere to DOCS guidelines in processing his proposal paperwork, related grievances and F.O.I.L. request, and in transferring him to another prison where he was placed in "keeplock" status.[2]  The Fifth and Fourteenth Amendments prevent the government from depriving anyone of life, liberty, or property without due process of law.  "A procedural due process analysis proceeds with two questions. '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  Shakur v. Selksy, 391 F.3d 106, 118 (2d Cir. 2004) (citations omitted).   Defendants are entitled to summary judgment on Plaintiff's due process claims as a matter of law because the evidentiary record, even when construed in the light most favorable to him, fails to demonstrate any basis for the finding of a violation of a constitutionally-protected interest.

> Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which an individual has a legitimate claim of entitlement. . . . If prison officials may [take an action] 'for whatever reason or for no reason at all,' . . . there is no such interest for process to protect.  The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the state does not create an independent substantive right.

Olim v. Wakinekona, 461 US 238, 250-51 (1983) (citations and footnote omitted).  In the prison context, legitimate procedural due process issues arise where the state has itself created a liberty interest in freedom from restraint "which, while not exceeding the sentence in such an

---

[2]     "Keeplock" is a type of administrative segregation that is less burdensome that disciplinary detention in a Special Housing Unit. See Lee v. Coughlin, 26 F. Supp. 2d 615 (S.D.N.Y. 1998).

unexpected manner as to give rise to protection by the Due Process Clause of its own force. ...

nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life." Sandin v. O'Conner, 515 US 472, 484 (1995) (citations omitted).

Plaintiff has identified no such atypical hardship.  His complaints regarding Defendants' alleged

failure to process his complaints, grievances and requests, even taken as true and construed in

the light most favorable to him, do not raise due process issues of constitutional dimension.

Defendants' motion is therefore granted as to those claims.


### F.  Establishment Clause Claim

Plaintiff also claims that the Defendants violated the Establishment Clause of the First

Amendment when they chose to implement CMP/CHSP in the prison chaplaincy and educational

department instead of under the auspices of Plaintiff, thereby allegedly favoring Christianity

over Islam.  "The Establishment Clause guarantees… that the government may not 'coerce

anyone to support or participate in religion or its exercise, or otherwise act in a way which

establishes a [state] religion'". Muhammad v. City of New York Dep't of Corrections, 904 F.

Supp. 161, 197 (S.D.N.Y. 1995) (quoting Lee v. Weisman, 505 U.S. 577, 584 (1992)).  The

government must neither encourage nor discourage religion and must maintain neutrality.

Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819, 839-840 (1995);

Higgins v. Davis, 2001 WL 262930, at *5 (S.D.N.Y. Mar. 15, 2001).  However, in a prison

setting, legitimate penological interests must temper assessment of alleged violations of the

Establishment Clause. Higgins, 2001 WL 262930 at *5; Warburton v. Underwood, 2 F. Supp. 2d

306, 316 (W.D.N.Y. 1998).

When presented with an Establishment Clause claim, a court must ask whether the challenged practice (1) has a secular purpose; (2) advances or inhibits religion in its principal or primary effect; and (3) fosters excessive entanglement between religion and the state. Lemon v. Kurtzman, 403 U.S. 602, 612-613 (1971). "[B]ecause plaintiff is a prisoner challenging a Department of Corrections directive, the Lemon test is tempered by the test laid out by the Supreme Court in Turner v. Safley, which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid 'if it is reasonably related to legitimate penological interests.'" Warburton, 2 F. Supp. 2d at 316 (citing Turner, 482 U.S. at 89).

The Court need not engage in a determination of whether or not the decision to establish the program under Fishkill's chaplaincy and academic departments passed the Lemon test, because the undisputed facts of record clearly demonstrate that Defendants' decision to establish CMP/CHSP under the auspices of the chaplaincy and educational departments, rather than under the auspices of Plaintiff's proposed inmate organization, was reasonably related to legitimate penological interests within the meaning of the Turner standard. No reasonable factfinder could conclude otherwise on this record. Defendants proffer that they established the program under the chaplaincy and academic departments because those two organizations had the most expertise and resources to draw upon and to ensure the coherence and consistency of the overall prison educational curriculum. Plaintiff himself has acknowledged that in any CMP/CHSP-type program he has worked with, the prison chaplaincy and educational departments were involved. (Perez Aff. ¶ 12). Such administrative staff oversight is clearly consistent with the penological interests of accountability, program integrity and the effective delivery of educational content.

Defendants' motion for summary judgment is therefore granted as to this claim.

### G. Equal Protection and Qualified Immunity

Plaintiff also claims that his Fourteenth Amendment equal protection rights were violated when Defendants engaged in an allegedly discriminatory and biased review of his proposals for Project Build and for the celebration of the life of Malcolm X because Plaintiff is an African-American Muslim. "The equal protection clause directs state actors to treat similarly situated people alike." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995) (see also Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). To prove an equal protection violation, Plaintiff "must prove that the decisionmakers in *his* case acted with discriminatory purpose." McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (emphasis in original).

Here, the Plaintiff presents no factual support for an inference of discrimination as to the denial of Project Build. Plaintiff claims that the Defendants were biased against him based on his status as an African American Muslim male long-term inmate who grew up in a poor neighborhood. (Am. Compl. ¶ 66; Pltf. Ex. 32.) His conclusory assertion is the only factual basis he proffers for this theory. He cites no racially or religiously-charged remarks and no comparable situations in which others have been treated better. Defendants have proffered facts to demonstrate that there were active minority groups and Muslim organizations within the prison offering programs similar to those Plaintiff proposed to lead, and that there were rational penological bases for their decisions denying his Project Build proposals. On this record, no reasonable fact finder could draw an inference of intentional discrimination. Thus, his equal

protection argument fails as to the denial of Project Build.[3]

As to the denial of his proposal for a celebration of the life of Malcolm X, Plaintiff asserts in his affidavit that it was his proposal and that it was denied based on animus toward him and the groups with which he was associated. However, as noted above, his own documentation demonstrates that Chaplain Muhammad was the proposer, and Defendants' evidence demonstrates that Chaplain Muhammad *himself* withdrew the Malcolm X proposal after discussions with prison administrators. (Salahuddin Aff. ¶ 48; Pltf. Ex. 43, Perez Aff. ¶ 51, Muhammad Aff. ¶5). There is thus no basis in this record upon which a fact finder could rationally conclude that Plaintiff's equal protection rights were violated by reason of a discriminatory denial of a proposal that he propounded. As Plaintiff's conclusory allegations are insufficient to frame genuine issues of material fact as to his equal protection claims, Defendants are entitled as a matter of law to judgment dismissing those claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its

---

[3] Even if pro se Plaintiff's claims were to be read liberally to advance a "class of one" equal protection claim that he was "intentionally singled out for treatment different from that accorded other prisoners for no legitimate governmental reason," his claim would still fail for lack of factual support, since he "has failed to adduce even the slightest evidence to support his claim... ." Jackson v. Burke, 256 F.3d 93, 96 (2d Cir. 2001).

entirety. The Clerk of Court is respectfully requested to enter judgment dismissing the amended complaint.

SO ORDERED.

Dated: New York, New York
February 2, 2006

LAURA TAYLOR SWAIN
United States District Judge